Case number 221958, Jennifer Root Bannon v. David Godin, et al. At this time, would counsel for the appellant please introduce himself on the record to begin? Good morning. My name is Mark Berthiaume. I represent the appellant, Jennifer Bannon, as representative of the state of Justin Root with me. At the counseling table is Allison Holdway from my office. Okay, counsel, and I'll ask you a question, and you can answer it once you start. But the president of this court, and it's very recent, is the state of Rahim v. Doe, which was decided, I believe, late last year, so I think it's important, and I know you've cited it in the brief, but if you could, I guess in your view, and I'm going to ask opposing counsel in their view, how do you distinguish that case, or why is it inapplicable to your case? I intend to address that, yes. I think that's the threshold, the most important question, I think. I'd like to reserve two minutes. Two minutes for rebuttal, okay. So as the court is well aware, this case arises out of the tragic death of Justin Root in February of 2020 when he was shot and killed by six officers, five Boston Police Department officers and a state trooper. We're here seeking the reversal of the district court's grant of summary judgment, which is a constitutional violation, and that qualified immunity did not attach. There's also been a dismissal of the Minnell claim, which I'm prepared to address as well, although the dismissal of that claim by the district court was based upon the absence of a constitutional violation also. I think that, and I'm happy to address the Rahim case quickly at the outset. But certainly, Rahim is a case in which there was a suspected terrorist that was suspected of wielding a knife, and the officers believed that they were in danger, and the suspected terrorist was advancing on the officers as they were backpedaling through a parking lot, and the court concluded that, based upon that evidence, that there was no constitutional violation for the court, for the officers to have fired shots. Unlike this case, I would submit that the facts of this case are dramatically different. I think what is the crucial factor here is the dispute of fact with respect to whether it was reasonable for these officers to believe that there was an immediate threat. Can I say that differently? As I see it, you're arguing that there are two distinct issues that need to be resolved by the jury. The first would be whether or not Mr. Root's hand was moving, because the officer's conduct depends on that, whether or not his hands were moving towards a weapon, presumably. And then the second issue, I think you suggest, is that the jury should be given an opportunity to weigh the credibility of the officers themselves. Am I fair to assert that, too? Yes, yes, that's part of it. I don't want you to get to that yet. What's your best evidence to support a conclusion that there is a material fact at issue as to whether Mr. Root's hand was moving? So first... Right before the officers. Correct. So, with respect to the record evidence, with respect to the condition of Justin Root at the time that shots were fired. The record... Counsel, we've got different times shots were fired, okay? So all of this starts when the officers receive a report that there is a man with a gun who is threatening people at Brigham and Women Hospital, and the officers receive reports that security sees him... Sorry, hospital security officer sees him with a gun, and in fact, he points a gun directly at that officer. Then the Boston cops are there, and they say he points a gun, and they shoot, okay? Is that what we're talking about, or is your case now down to the final lethal shooting after he has been wounded, and he staggers over to the grass in the Fenway? The case has never been about the first shooting. There's nothing in the complaint. We don't allege a constitutional violation arising from the shooting outside the Brigham and Women's Hospital. This case is about the shooting that took place in Brookline. It's always been about that case. It's never been about the other shooting, and the evidence before the court and before the district court included the fact that Justin Root had been shot in Boston. The officers believed that they had shot him, that in the six minutes between the time he bled profusely, his car was full of blood. He had lost 2,000 cc's of blood, it was estimated in the ambulance report, by the time he got into that incredible, serious motor vehicle collision at Brookline and Hammond Street. The video evidence, we have video evidence of him getting out of his car, falling as he tried to get out of his car. I'm sorry, is the argument you're making that he was in such a weakened condition that even if the officers perceived him as reaching into his jacket and saw the handle of a gun, they nonetheless should not have shot him? Correct. Well, in part, yes. And in part, the fact that given the evidence of his condition, as described by Shelley McCarthy, three seconds before the 31 shots were fired. She was with him by his side up to three seconds before shots were fired. She described- At the time the shots were fired, an independent witness, not associated with the police, verified that he too saw that the decedent was reaching into his jacket and pulling something out. That's not true. That is Dr. Gravato that you're referencing. Dr. Gravato, first of all, there was no deposition, there was no affidavit of Dr. Gravato. It's all hearsay that is in the record, which is not admissible for purposes of summary judgment. That said, Dr. Gravato doesn't say that he was reaching. If you look at the record, what's in the report, a hearsay report, is that he took his hand to his chest. There was nothing about reaching or using the term reaching that Dr. Gravato said, not to mention the fact that Dr. Gravato was in his car across Route 9 on a rainy day with these officers in front of him. To go back to my colleague's question, I now understand you to be making two arguments. One is there was insufficient evidence to support the officers' assertions that they saw him reaching into his jacket. I'm sorry, three different arguments. One is reaching into the jacket, the other is they saw something that looked like a portion of a gun. Then, I believe your third argument is even so, he was not a deadly threat to the officers and they should not have used deadly force. Is that correct? Yes. Just to state it differently, our position is one, that there is ample evidence in the record for a rational jury to conclude that Mr. Route was not capable of reaching or making a threatening gesture based upon that evidence in the record. That's a genuine issue of fact that should be decided by a jury. Second, there's a genuine issue of fact as to whether these officers actually believed he was reaching. That's a second critical factual issue. We cannot simply accept their self-serving statements and accept them as fact, as the District Court erroneously did. Their credibility, the weighing of evidence is a jury function. Not only are we simply saying, well, we have a right to cross-examine these officers, there is evidence in the record concerning the lack of credibility here to this story. It was fabricated. That is our position. What evidence do you have on your behalf that creates the genuine issue of material fact? That counters that evidence, or not counters, but at least puts it in question. First, their violation of their own rules. Unlike all of the other witnesses who were interviewed on the day of the shooting, the five BPD officers and the State Trooper were only interviewed five days later and the State Trooper seven days later. Contrary to BPD rules, specific rules where witnesses are to be separated, these officers met as a group, the BPD officers met as a group before they were interviewed for the first time. Critical. I mean, they met as a group to discuss their initial interviews and surprise that they have a reaching argument that they come up with. I mean, that in and of itself... I hear what you're saying, but ultimately that kind of boils down to an allegation that the officer's testimony, either they're lying or it's inconsistent, but I think just saying or alleging the officers are not telling the truth doesn't get this case to the jury in terms of the credibility issues. Do you have more than that or is that what you're resting on? Absolutely. With respect to credibility, I think the court relies on the fact that there was this reaching. The most important factor under Graham, as the First Circuit stated in McKinney, the most important factor is the immediacy of the threat. There has to be... Counsel, I'm sorry. You seem to draw a distinction between him moving his hands toward his chest and he was wearing a jacket, right, and he's moving his hands to the area of his chest where his jacket is. As I understood it, you concede that he was doing that. In fact, in some ways you depend on that. You seem to be arguing there is a real distinction between that and reaching, but if his hand is moving toward his chest and these officers know from earlier that he has been shooting at people and that he is now trying to evade the police, why wouldn't they think that simply moving his hand toward his chest was a threat to them? I do not concede that he was moving his hand to his chest. That is their story. Do you have a witness or some testimony that creates an issue of material fact that that was not happening? Well, Shelley McCarthy testified that at the time she left his side, three seconds before the shots were fired, he was clutching his chest, struggling to breathe, his gurgling blood, his eyes... So the witness you are relying on has him reaching to his chest? No. So what... I'm missing the point here. The point is that from the time the officers arrived, Justin Root is on the ground clutching his chest, desperately trying to breathe. There's no arm movement, there's no reaching, there's no going from here. Officer McMenemy testified that he stood up, he stood up, opened his jacket with his left arm, reached with his right hand. But so that gets back to the first question I asked you. I think if you're conceding that his hands were moving into his jacket, then we don't  There's definitely no material issue of fact here, right? No. Again, that's... So you're not conceding? One, I don't concede that his arm was moving. My position is, and the position that we've taken throughout, is that he was incapable of reaching or moving his arms. He was in there holding his chest. So what is your best evidence that his hands did not move, that there's a real question or there's a reasonable inference that his hands were stationary? His condition, the amount of blood loss, he was covered in blood. Shelly McCarthy's saying his eyes were in the back of his head, that he was... His eyes were... The lights were on, but nobody was home. And that he had his... So you have the testimony of Ms. McCarthy, who I think was an EMT, and she was, I think we saw in the video, holding him or touching him very close to him. She observes that he's gurgling blood, that he... In her belief is he can't get up, and that the entire time she's, I think, maybe a foot or two away from him, his hands, his right hand's at his chest, his left hand's down. I suspect what the defendants here are going to say is, but Ms. McCarthy, and it was just seconds, but was blocked or could not see when the actual shots were fired. Well, correct. I mean, I conceived it, that she wasn't looking at him at the exact second that shots were fired. What we have is the officers saying that he was moving or taking action that they believe to be threatening. And so you have this situation where the best witness is dead, right? That we can contradict that he's dead. You have six officers who are left there standing who will say, in that two-second, three-second period, he moved in such a way that we believed we could fire. I submit, there are genuine issues of material fact that a jury should decide based upon this evidence and the lack of credibility. I mean, I touched on the meeting that they had in advance, but our briefs and reply brief detail the lies, the lies that were being told by these officers. Clearly, clearly, that is something that a jury can consider. Trooper Keneally testified in an effort to embellish his story that he was reaching and that he was going for a gun, that when he rolled him over, he removed that black plastic BB gun from his right hand, under oath, under oath that he removed it from his right hand. When we know, based upon the evidence, the autopsy report, that his right hand was mangled. There was a bullet that penetrated through the palm and exited the back of his right hand. This black plastic BB gun has absolutely no damage whatsoever, no blood on it. It is impossible. And we had expert witness testimony to that, but frankly, it's common sense. So why, you think, shouldn't a jury be considering, if Trooper Keneally is lying about that, couldn't he be lying about the fact that he believed he was reaching? Isn't that a jury function and not the function of a court to rule as a matter of law that these six officers, having killed Justin Root, can then say, well, I thought he was reaching. I thought he was reaching. Notwithstanding the fact that three seconds before, we have a witness that said he was effectively comatose, that we have ample evidence to suggest that Trooper Keneally is lying, that Officer McMenemy has him telling a story about standing up and reaching, that Officer Golden lies about the fact that he even had his body camera on. They don't put their body cameras on. When I first took this case, I assumed we'd know exactly what happened because of the mandatory body camera policy. But it's ignored. They don't, they put it on when they want to. And so, you have, you have, so, um, I think we're getting into the realm of rhetoric. I'm sorry. You have rebuttal. You have two minutes for rebuttal. So, let's hear then from, uh, defense counsel, appellees. Thank you. Okay, let's hear from Mr. Whitsell for, uh, all defendants, uh, appellees, except Mr. Mona, uh, except Mr. Connelly. Yes. Thank you, Your Honor. Um, good morning, Your Honors. May it please the Court. My name is Edward Whitesell. I'm with my colleague, Bridget Davidson, uh, from the City of Boston Law Department. I represent the individual officers from the Boston Police Department, as well as the City of Boston in this case. And let, let me start with, with the question, uh, because you, uh, in your brief, it, it's cited in, uh, uh, Officer Connelly's brief, uh, the State of Rahim case, but you don't, you don't rely on that case in your brief. So are you relying on it now, or you're not going to? Your Honor, I do rely on Rahim, I read from the Qualified Immunity section. Um, Rahim was a Qualified Immunity case. Uh, I, I would say from the outset, I think, uh, the analysis by the District Court on that was accurate. Um, but I think we only get to that point if the Court is to find that there wasn't, or there, there was a constitutional violation in the first place. I think the Rahim case kind of skipped over that initial, uh, question, uh, that you would say. For counsel for a City of Boston, one would think you would want, uh, both rulings to protect you. Can we get to what, I think, was the guts of the argument just made to us, that his hand, the decedent's hand was on his chest, that, uh, he was gurgling, uh, blood, uh, he was having difficulty breathing. There was no way he was moving his hands into any area of his jacket that could have had a gun. Understood, Your Honor. Okay? What's the evidence to the contrary? The evidence, the only evidence is to the contrary. You have, starting first and foremost, with the testimony of all of the officers who were present at the scene and fired their weapons. Two of the officers said that they saw the handle of a gun. Two of the officers from the Boston Police Department said that they saw him reach for his jacket. Uh, and one of the officers was not in a position to be able to see, uh, what he was doing with his hands at the time. Uh, so you have actual testimony that the court is allowed to consider on summary judgment, uh, from what was... And what did the doctor say? And the doc, and the doctor verified that. The doctor said that he could see, uh, the hand near the chest, uh, immediately prior to shooting. The evidence to the contrary, uh, or... Could you quote, please, from the doctor? There seems to see, be some dispute as to what the doctor actually said. Your Honor, I will concede that either way, whether, um, either way, it's not a disputed fact that changes the outcome. Uh, if he's simply saying he saw his hand near his chest, that's consistent with and corroborates the testimony of the officers who say that he was reaching towards his jacket, uh, at the time. The short answer appears to be you do not know exactly what the doctor said. As I stand here now, I do not know, Your Honor. It is in the record. All right. Uh, I would like... Go on. I would like to address briefly the inadmissibility argument. Obviously, inadmissibility, the standard under Rule 56 is at trial, not in the papers. Uh, obviously, he could be called as a witness, subpoenaed to testify, and he could say the same things that he said in this document. Um, obviously, third-party depositions are technically inadmissible. We use them all the time to support summary judgment. So, the question is really about inadmissibility. It's about the substance of his testimony and what he will say on the stand if this case were to go to trial, and that is that he will offer corroborating testimony as described by the, um, appellant in the light that they think is the most favorable. It still corroborates the officer's testimony. Let, let me, let me, counsel, uh, for purpose of summary judgment, evidence has to be admissible. It, it's... It doesn't have to be admissible on the summary judgment record. It has to be in a form that will be admissible at trial. Correct. So, if the doctor gives a statement to the police, we can reasonably assume that that is what his testimony is going to be when he testifies at trial, and his testimony to that extent while he's on the stand would then be admissible. Okay, let, let me ask you, and I ask the opposing counsel, any examples of anything that contradicts any material testimony, uh, because I haven't heard of anything. No. Um, you have a witness who was on the scene immediately prior, uh, who contends that he was incapable of having reached or gotten up or done anything in the moment, but she was told when the officers arrived on the scene to run. They thought that he was a threat to her as well as the officers. So two of the officers, there's evidence in the testimony, yelled, run, run, and she complied. She got up, she ran away from the scene, and she had moved towards her car, uh, the record is fairly clear that she did not see anything, uh, I believe that she had her back to the, to the scene running, and as she testified, she did not see anything at the moment that the shots were shot. I think what she testified was that her view was blocked. She, she was, even if that's the case, she's unable to see what, um, Root was doing at the moment in time when the officers are making the decision to fire. I guess what I'm wondering is, and I, I think I'm understanding the, the, um, evidence correctly, but, uh, I think there's a, a medical testimony that he had lost, uh, so much blood as to be, um, physically incapacitated or, or to have difficulty moving physically. We know, we know in the car there's a lot of blood. We know this, um, uh, woman, Ms. McCarthy, was, was close to him and saw him and, and she believed he couldn't move, so, and we know she didn't see, um, the few seconds after she left, and I, I watched the video a number of times, I think, you know, it's definitely less than 10 seconds, I think it might be less than 5 seconds, and we know at the moment when she left, his hands hadn't moved. The independent doctor, uh, bystander also says his hands were at his chest. So I'm wondering if there's a reasonable inference, just one inference of many, about whether his hands moved. And I think I understand your opponent as arguing among other, other things. That's one reasonable inference. There are others, I think, right? Another reasonable inference is that, um, he was holding a gun, as two officers saw, or that his hand moved into his jacket. So what are we to make of that first? And I would argue that's not a reasonable inference. We have video from traffic cam footage taken immediately prior to the shooting, seeing him getting out of the car, walking over towards the star market, he stumbles, he gets back up, he stumbles again, he walks over towards the mulch area. And within seconds of the shooting, he's ambulatory. So it's, it's, I, I, I'm sorry, can the officers see that he has gotten out of the car, he is ambulatory? I, the record, so there's a video, but that's not the issue. The issue is what the officers knew and reasonably perceived at the time. Understood, your honor. I'm trying to rebut the issue of whether or not there's a reasonable inference to be drawn from Shelly McCarthy's testimony, not suggesting that the officers knew that he was ambulatory. The officer's statements, I don't believe there's any evidence in the record to show that the officers were there in time to see the same thing that we see on the traffic cam. No, your honor. Okay. And it follows from that, that they would not have known the degree of blood loss. No, your honor, I don't, I don't believe they would have known that either. And how, how long when the officers get on the scene before the shooting, how many is it, how many seconds or, or that's the time? It's when the officers arrive on the scene, it's a very brief period of time. Justin Root arrives first and you can see on the video, there's a period of time before the officers catch up. The car accident happens at an intersection in front of the Star Market and there, it's a pretty significant car accident. The police officers were trailing behind. I think there was a moment in time where they had to get around that accident to get to the area where his car ultimately stopped. But it's certainly less than a minute. But when they, they spot him and they, they shoot him, how, how, less than a minute or is it seconds? When they spot him, it's within seconds. They come around the same way that he came from his car. They come around to the multi-area. Officer McManamy. So, so from the, so from the record, it's not like they get off, they look inside the car full of blood, they see that, they investigate, they just, you know, get there as quick as possible to face, confront him, correct? They follow him. I mean, you, you, they follow. When they confront, when they confront him, you know, finally, it's, it's a matter of seconds, correct? Well, Officer McManamy engages, he approaches Root first and uses his foot to push him to the... What do you make of that? Because I watched that on the video. So, so it's, I mean, it's literally, it's like a second before the shooting happens. But so he approaches, gets close enough to kind of kick him or touch him with his foot. And his testimony is that he started to get back up, so he backed off. So are you asking... I didn't see that, but... Are you asking whether or not the kick itself is, rises to the level of excessive force? I would suggest certainly not in those circumstances where he believes he may have a gun. So I don't think that that in and of itself would rise to a level of excessive force if he's concerned about whether or not this person might have a gun. And from the moment of the kick to the shooting, how long is that, like two, three seconds, right? Yes. I do, I do want to say, and I'm running out of time, I do want to say that the Rahim case I do think is on point, and I think the district court determined it was on point, that was a case that jumped to the second prong, to the qualified immunity aspect of it. I do think this case is a case where there was no constitutional violation, that it was objectively reasonable for the officers in that condition, based on everything they knew, the calls that they'd been receiving over the radio that morning, the police-involved shooting that got called out, the 303, the things that they saw at the scene and that they testified, they witnessed immediately prior to the shooting, those all lend in favor of a finding. So your position is we decide no constitutional violation, we don't have to go to qualified immunity? Yeah, we don't have to do that at all, Your Honor. I think if you find there's no constitutional violation, that resolves every claim in the case. I did not address them in LSU. If I could just briefly say, I think this court has the power, if it were to say there was qualified immunity, but not a constitutional violation, I think the court has the power to analyze them in LSU. The facts are all in the doc. But if there's no constitutional violation, then when they're in LSU, it's... Exactly. So if you say no constitutional violation, I think... That's been fully briefed. Okay, thank you, Your Honor. Thank you. Let's hear then from... Yes, Ms. Lynch. I have a question. So, sadly, this court has seen a number of cases that come under the label suicide by cop. It usually involves a mentally ill person who threatens somebody else and is told to put down the weapons and chooses not to do that. And there has been concern in some of the cases about the adequacy of the training of the police officers to deal with those suicide by cop situations, usually involving mental health issues. I kept reading the briefs to ascertain whether this was one of those cases. I didn't see any assertion that this fell into that category, that this was a mental health issue or that the cops should have recognized that and that they were inadequately trained to respond. I didn't see that in the briefs. So this comes down to the sort of training that the officers receive as to when it's I think the contention here is, once they get beyond the hurdle of a constitutional violation, that the city and the state do not provide adequate training. Could you just spend a couple of minutes on the training that is provided according to what was put in the record? Sure, yeah. This is fully briefed in the Monell section. It is an argument that wasn't considered by the district court below. There are a significant number of training hours that are supported by the documents in the record for each of the four officers who trained at the Boston Police Academy on the use of force. The Boston Police Department maintains rules on the appropriateness of force, Rules 303, Rules 304, and its subsections. On non-lethal force, 303 is the rule that applies here. It's a rule that has developed over time. The officers are trained in it. They're trained on the law. They're given, I think, 80 hours worth of time on force training and things like that, but the exact numbers are in the briefs and in the record. There's a significant amount of training, and there's evidence in the record that all of the officers here received that training. One of the officers was a transfer from another department, but he testified that he received that kind of training at that department. So there's significant force training. Just to briefly address the mental health issues, I don't think this is a suicide cop-by-cop case or that it's been suggested as such. There has been the implication that there are mental health issues in this case, and I don't think anyone disputes that. I think what the city would dispute is that the officers knew that when they arrived at the scene that day or had time to determine that or process that. There was nothing about the call that would make them believe. I know there's one case that's cited from a different circuit where there was a call that was a 76 call, which the officers should have known was a mental health call. That is not this case. There's been a reference to the Coleman case, which is another case where there's been suggestions about mental health that's currently pending in the district court. That's a case where they knew there were potential mental health issues, and they brought EMS with them. That's not this case. They got a call. But what type of training do your officers participate in, in terms of responding to mentally ill? There are rules about mental health, and I know there's training, but I don't believe that's part of the record, Your Honor. So I don't know off the top of my head. That's never really been the crux of the Monell issue. But there's no allegations of a mental health issue in the complaint. This is excessive force. It's a constitutive violation. It shouldn't have been under the facts of the case. As it relates to the actual claims, yes, Your Honor. I think it's been referred to in the background in the facts that there may have been mental health issues, but I don't think that's at all important. But there's no evidence on the record that the officers knew or should have known. There's no evidence that the officers knew or should have known. No. Okay. Thank you very much. Thank you. Let's hear, then, from Mr. Moynihan. Thank you, Your Honors. May it please the Court, Daniel Moynihan on behalf of Trooper Connealy. Our position on behalf of Trooper Connealy is that there are no genuine issues of material fact concerning the use of force. Our position is that there is no Fourth Amendment violation on the part of Trooper Connealy. Our position is that the district court properly weighed the gram factors. The court properly went through the severity of the crime, which really wasn't an argument, as far as I recall. They then addressed the issue of immediate threat. The appellant's argument, I believe, here is that a reasonable jury could find that he did not pose an immediate risk. I would submit that the facts are completely contrary to that. The facts, I don't want to go through all the facts for the court, but as you may know, Trooper Connealy came into this scenario in what we call in the district court scene three. Trooper Connealy is positioned on Route 9. Trooper Connealy, his radio scan about shots fired, shots fired at a security officer at the hospital. Trooper Connealy then observes this parade of cars coming down Route 9 past him. His first inclination is to an alternative venture to drop what they call stop sticks. The car goes by at approximately 90 miles per hour. A group of Boston cruisers go past him. He then turns to follow the speeding vehicle. He then observes a massive car accident on Route 9 where multiple vehicles were involved, injuries were involved. He does observe Mr. Root limping to the, there's a question about whether he's limping or moving fast or walking fast over to the mulch area. He gets over to the mulch area and he's told he has a gun in his coat. He observes Mr. Root clutching his chest, which I think that's not, I don't think that that's disputed by anybody. His hand is on his chest. Ms. McCarthy says he's clutching his chest. Difference between clutching, grasping, reaching. I would submit that there's, the hand is there on the chest. The knowledge by Trooper Connealy is there that there's a gun in the coat, and in fact this replica gun was found in the coat. The hand is on the chest. The question here I think is that very specific question, how much was the hand moving and is there any evidence to rebut? And the district court clearly said there was no evidence to rebut. I did have the benefit of checking what the court said about Dr. Gabot, and Dr. Gabot said that on page 11 of the opinion that he saw Mr. Root reach into his jacket immediately before the officers opened fire. So based on the totality of the circumstances there, what Trooper Connealy knows at the scene, what he's told at the scene, what he's told about the gun in the jacket, the hand on the chest, what he says is that he sees the hand move into the jacket and he sees the butt of a gun. Multiple warnings given by both Connealy and the BPD officers. There's a failure to comply here. I would submit that based on the McKinney standard, the wide standard, the wide zone that officers are given in this split-second scenario, this was a chaotic scene. We had all the exigencies that the courts look for, emergency situation, chaos, shots fired, auto accident, public. This is all in front of a public mall, by the way, where this is occurring, which is where Ms. McCarthy was directed to run to. And I would point out that it is in the record that she did not see the exact point of the shooting. So again, it confirms that there's no credible evidence. There's actually no evidence to rebut as the district courts have. Let me ask you something. Your client, he's a state trooper, correct? He is. So he gets there to the scene when it happens, but he's not in cahoots or acting in concert with a Boston officer. It's two police forces. He's the single one, other officer. But they all show up there, and basically that's when the shootout takes place. Correct. He hears it on a scanner, Your Honor. And, in fact, he didn't attend any meetings with any BPD officers, contrary to what was said earlier. But what I'm saying is, is there any issue of material fact that what he says versus the municipal office, it's different or their testimony is inconsistent to create an issue of fact? The testimony is consistent. The testimony of the BPD officers is consistent with what Keneally observes, what Keneally testified to, to the DA's office and in his deposition. And your client also shot at the deceased, right? He did. He did. And, as I say, he didn't. And he wasn't taking orders from the police, Boston police? No. Nor vice versa? No. He acted on his own. And, again, he had the alternative thought first, deploy stop sticks, and he, in fact, thought, as it's in the record, of tackling Mr. Root until he was told, hey, he's got a gun in his chest. Okay. Thank you. Thank you. And just qualified, so our position is no Fourth Amendment violation. Qualified immunity would attach, Rahim would attach, if we get that far. Okay. Thank you. Okay. Two minutes for rebuttal. First, with respect to Dr. Grabato, to be clear, there is no admissible evidence with respect to what Dr. Grabato said, and he did not say he was reaching. To suggest that they can rely on hearsay to support this as corroboration is contrary to Rule 56. No question about that. The fact that Dr. Grabato can come in and testify at trial, absolutely. But he hasn't submitted an affidavit. He hasn't been deposed.  Excuse me. Why didn't you depose him? We only had ten depositions. We were limited. Six of them were sitting here. We didn't have that opportunity. We sought additional discovery. We were denied additional discovery. But we didn't have that opportunity. We sought to talk to him. He wouldn't talk to us. So that's the fact. But if he took the stand at a trial, we'd certainly have the opportunity to discuss this. Second, with respect to Trooper Connealy and his credibility, no mention is made. He said he found a gun somewhere on his body. He testified that they took it out of his hand. He lied. This family has a right to test this before a jury, to test his credibility. This is the same Officer Connealy who, after firing the shots, walked out of the mulch area and immediately approached Officer McMenemy and says, Keep your effing mouth shut. Don't say anything. Is your union rep coming down? And Officer McMenemy says, I won't say anything. Is that what you say if you have nothing to hide? If you're the hero here and immediately cease to threat? Keep your effing mouth shut? It is up to a jury to decide this case. I just want to close with this quote from Lamont. It's unfortunate here that they keep banging the fact that it's the six officers and what they say has to be believed here. As the Third Circuit said in Lamont, Because the victim of deadly force is unable to testify, we have recognized that a court ruling on summary judgment in a deadly force case should be cautious to ensure that the officers are not taking advantage of the fact that the witness most likely to contradict their story, the person shot dead, is unable to testify. This court should avoid simply accepting what may be self-serving accounts by officers. It must look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story. Consider that evidence. And I submit that Shelley McCarthy's testimony concerning his condition is critical. And the issue is not whether, if he's not capable of moving, if a jury were to believe Shelley McCarthy and draw reasonable inferences from that, again, a jury function, a rational jury could conclude there could have been no movement. It's up to a jury to decide that. It's not up to this court to say we're just going to accept what these officers say because Mr. Root is dead, he can't contradict it. You know, well, that's the way it is. As for Rahim, Rahim was a case in which there was a threat. There was threatened behavior. Here, that's a question of fact. There's a question of fact as to whether there was threatening behavior, which is the linchpin here of the constitutional violation. Okay. Thank you, counsel. Thank you. You're all excused. Thank you. That concludes argument in this case. Call the next case, please.